## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT J. POGATETZ,** | ) | |
| | ) | **No. 12 CV 4060** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,**[1] | ) | |
| | ) | **December 17, 2013** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Robert John Pogatetz seeks social security income ("SSI") and disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, based on his claim that chronic joint pain has rendered him unable to work. After the Commissioner of the Social Security Administration denied his application, Pogatetz filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court is Pogatetz's request seeking reversal of the Commissioner's decision. For the following reasons, the request is denied:

### Procedural History

Pogatetz applied concurrently for SSI and DIB on July 9, 2009, claiming that he became unable to work on December 31, 2008. (Administrative Record ("A.R.") 12.) After his claims were denied initially and upon reconsideration, (id. at 108-12,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

115-16), Pogatetz sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 123-24). The ALJ held a hearing on August 4, 2010, at which Pogatetz, a medical expert, and a vocational expert all provided testimony. (Id. at 37-100.) On November 24, 2010, the ALJ issued a decision finding that Pogatetz is not disabled within the meaning of the Social Security Act and denying his claim. (Id. at 12-26.) When the Appeals Council denied Pogatetz's request for review, (id. at 2-4), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On May 24, 2012, Pogatetz filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

### Facts

Pogatetz, who currently is 41 years-old, suffers from chronic pain in his right shoulder and many other joints (hips, knees, ankles, elbows, and left shoulder), as well as from visual disturbances including blurriness and floaters. He also struggles with emotional problems, including anxiety, depression, panic attacks, anger, and insomnia. He attributes the vast majority of his physical ailments to an adverse reaction to taking fluoroquinolone antibiotics in 2002.[2] A college graduate, Pogatetz worked as an administrative receptionist between 2004 and 2010 and was responsible for filing, typing, and general office work. His earnings in 2009 and

---

[2] Fluoroquinolones are a class of antibiotics commonly used to treat respiratory and urinary tract infections and include ciprofloxacin (Cipro), levofloxacin (Levaquin), and norfloxacin (Noroxin).

2010 were insufficient to amount to substantial gainful activity, thus the ALJ found that his date of last gainful employment is December 31, 2008. Pogatetz is currently unemployed and lives with a roommate who helps him with activities of daily living. At his hearing before an ALJ, Pogatetz presented both documentary and testimonial evidence in support of his claim.

## A.    Medical Evidence—Physical Health

The relevant medical record begins in 2003, when Pogatetz sought care from Fantus Health Center (part of the Cook County Hospital system) for a host of problems he linked to his 2002 antibiotic use, including vision problems and joint pain. (A.R. 378-83.) Despite his complaints, his eye examinations in April and August 2003 revealed 20/20 vision in both eyes and a neurology exam in April 2003 was unremarkable. (Id. at 379, 382-83.)

In 2006 Pogatetz fell from his bicycle and injured his right shoulder. (Id. at 325.) To address this injury, Pogatetz visited Dr. Steve Clar, a physician with the musculoskeletal clinic at Stroger Hospital, who examined him in October 2007 and ordered an x-ray and MRI to rule out a rotator cuff tear. (Id. at 340.) The MRI revealed a "suboptimal evaluation of the labrum, but no definite evidence of [a] labral tear." (Id. at 325.) The MRI also revealed some very mild acromioclavicular joint ("AC joint") osteoarthritis, as well as supraspinatus tendinopathy and some very small subchondral cysts, but no evidence of a tear. (Id. at 325-26.)

Pogatetz began occupational therapy in January 2008 to strengthen his rotator cuff and stabilize his scapula. (Id. at 363.) His stated goal was to return to

biking and weightlifting and to improve the quality of his life. (Id.) In a report dated January 11, 2008, the occupational therapist noted that Pogatetz tolerated the session well, although he suffered "slight" pain of four on a pain scale of ten. (Id. at 364-65.) Pogatetz apparently continued with occupational therapy for some time, but the ALJ found no other medical notations in the record reflecting additional sessions.

In January and February 2008, Pogatetz relayed to Dr. Clar that he had also been experiencing knee pain for four years. (Id. at 341-42.) Dr. Clar urged a continuation of occupational therapy and suggested strengthening exercises. (Id. at 342.) In May 2008 Dr. Clar injected Pogatetz's right shoulder with a corticosteroid medication, (id. at 343), but Pogatetz complained at a follow-up appointment of worsening pain following the shot, (id. at 345). A second MRI in September 2008 showed "[u]nchanged supraspinatus and subscapular tendonopathy [sic] from prior study" and "[n]o definite MRI evidence of [a] tear." (Id. at 327-28.) In October 2008 he told Dr. Clar that he was using a TENS unit twice a day and taking Tramadol for pain. He also complained of experiencing shoulder pain of six or seven on a pain scale of ten that radiated down his arm. (Id. at 347.) Dr. Clar's notes from this time period indicate that he examined Pogatetz's shoulder and observed a full active range of motion, no AC joint tenderness, a negative drop arm test, a negative Neer's Test, but a mildly positive Hawkins Test. (Id. at 347, 371.) Dr. Clar ordered a third MRI several months later in April 2009, this time using a contrasting dye, and the findings revealed a possible "small partial anterior-superior labral tear." (Id. at

330.)  The MRI also identified a few subchondral cysts, unchanged from prior MRIs, but no other abnormalities.  (Id.)

The following month, Pogatetz visited Dr. Jacob Manuel at Stroger Hospital's outpatient clinic, complaining of right shoulder pain despite physical therapy.  (Id. at 362.)  An examination revealed some "posterior capsular tightness" and "tenderness with provocative maneuvers of his biceps" but good strength in his right shoulder and good overhead flexion.  (Id.)  Dr. Manuel discussed arthroscopy with Pogatetz but indicated that the hospital was unable to perform the procedure and for him to continue with physical therapy.  (Id.)

In July 2009 Pogatetz applied for SSI and DIB benefits.  The following month Nurse Practitioner ("NP") Dan Ceballos of West Town Neighborhood Health Clinic examined Pogatetz.  He noted Pogatetz's medical history and subjective complaints, and recorded objective findings that Pogatetz was able to ambulate with a steady gate but had knee and shoulder pain, tenderness, and diminished strength (two on a scale of five).  (Id. at 424-25.)  On August 21, 2009, NP Ceballos completed a Chronic Pain Residual Functional Capacity Questionnaire on Pogatetz's behalf.  (Id. at 411-18.)  He provided diagnoses of chronic pain, tendinopathy, and neuropathy; cited clinical findings of numbness, poor strength, and an inability to raise the right arm past the shoulder; and listed Pogatetz's prognosis as "poor." (Id. at 411.)  NP Ceballos also noted mental health vegetative symptoms of depression and anxiety. (Id. at 412-13.)  As to Pogatetz's ability to work, NP Ceballos found that he: (1) would be absent from work more than three times a month; (2) would be completely

unable to use his right extremity to manipulate, twist, grab, or reach objects; (3) would be able to use his left extremity only about 20 percent of the time in the performance of those same activities; (4) could never lift anything; (5) was severely limited in his ability to deal with stress; and (6) would need to take a 15-minute break every hour. (Id. at 414-18.)

On September 1, 2009, Dr. Liana Palacci conducted an Internal Medicine Consultative Examination at the request of the Illinois Bureau of Disability Determination Services ("DDS"). (Id. at 390-93.) During the 45-minute physical examination, Dr. Palacci noted that Pogatetz was in no acute distress but was wearing his right arm in a sling and had a TENS unit on his right shoulder. (Id. at 391.) His vision was 20/20 in both eyes. (Id.) Pogatetz exhibited severe pain during range of motion testing of his right shoulder. (Id. at 392.) Otherwise, his exam was normal: all other joints exhibited normal range of motion, plus he could squat down, bear weight, heel-and-toe walk, had normal grip strength, and negative straight leg testing. (Id.) He was well-dressed, alert, pleasant, and demonstrated no apparent cognitive difficulties. (Id.) Dr. Palacci also noted that Pogatetz had mild difficulty twisting a door knob with his right hand but otherwise was able to complete all other fine and gross motor tasks, including tying his shoelaces and buttoning. (Id. at 394.)

State examining physician Dr. Richard Bilinsky completed a Physical Residual Functional Capacity Assessment later that same month on September 22, 2009. (Id. at 395-402.) Dr. Bilinsky opined that Pogatetz is able to lift 20 pounds

occasionally and 10 pounds frequently, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Id. at 396.) However, on account of his right shoulder tendinopathy and decreased range of motion, Dr. Bilinsky recommended restrictions with respect to Pogatetz's right extremity, including overhead reaching, crawling, and climbing. (Id. at 396-98.) Dr. Bilinsky believed that Pogatetz's claims of pain and physical limitation were only partially credible as "[t]he medical evidence in [the] file shows some problems but not to the extent indicated." (Id. at 402.)

In October 2009, Pogatetz sought care from Dr. Sami Takieddine, a physician with Stroger Hospital's pain clinic, who noted that Pogatetz was "comfortable [and] smiling" while reporting a pain level of eight out of ten. (Id. at 556.) Upon examination, Dr. Takieddine noted a completely normal gait, a normal range of motion in his joints, a normal soft tissue examination, and normal muscle strength. (Id. at 557.) The doctor also observed him getting up from his chair and walking around the clinic with no difficulties, and further that he "plac[ed] his heavy bag on the same shoulder that he reports severe pain in." (Id.) Finally, Dr. Takieddine noted that Pogatetz's complaints of "[m]ultiple joint[ ] pain . . . is out of proportion to the findings on physical exam," and further that he is not a candidate for any injections as "he reports long lasting adverse reactions" to steroid injections and past medications. (Id.)

The next month, in November 2009, Dr. Clar completed a Chronic Pain Residual Functional Capacity Questionnaire. (Id. at 299-304.) He provided

diagnoses of right shoulder chronic supraspinatus, subscapular tendinosis, and a possible labral and capsular tear. (Id. at 299.) He identified only the right shoulder as a source of pain, and rated Pogatetz's pain as a six to seven on a pain scale of ten. (Id. at 300.) He opined that Pogatetz would be absent from work more than three times a month, that he had severely limited use of his right extremity in performing repetitive activities, and that he would need to take a five-minute break every thirty minutes during an eight-hour workday. (Id. at 302-04.)

In January 2010, Pogatetz met with Dr. Nishitkumar Patel of Mount Sinai Hospital Medical Center for an orthopedic consultation. (Id. at 518-20.) An examination of the right shoulder revealed tenderness upon palpation but no swelling, abnormality, or subacromial tenderness. (Id.) Active and passive range of motion exercises revealed full motion, although cross-body adduction produced some AC joint pain. (Id.) Dr. Patel reviewed Pogatetz's three MRIs and noted the presence of tendinopathy and a "questionable labral abnormality" but also informed Pogatetz that tendinopathy is not unusual for someone in early middle age. (Id.) He then referred Pogatetz to Dr. David Garelick, a shoulder specialist. (Id. at 520.)

In March and April 2010, Dr. Clar ordered an MRI of Pogatetz's left shoulder, as well as x-rays of his left shoulder and hand. (Id. at 549-54.) All of the tests came back unremarkable with no evidence of any abnormalities. (Id.) Also in March 2010, Dr. David Edelberg of WholeHealth Chicago examined Pogatetz, following his first examination back in October 2009. (Id. at 505-07.) In October 2009 Dr. Edelberg noted Pogatetz's condition as "quinolone induced polytendonitis and

polyneuropathy; cortisone/quinolone induced severe tendonitis right shoulder," and prescribed Vicodin and Xanax.  (Id. at 507-08.)  In March 2010, Dr. Edelberg re-examined Pogatetz and noted "excruciating pain throughout his entire body, aggravated by falls during the past year; now living literally a bed chair existence and unable to type, hold a cup of coffee."  (Id. at 505.)  He switched Pogatetz to Methadone and Restoril.  (Id.)

Dr. David Garelick of Mount Sinai Hospital, the shoulder specialist, examined Pogatetz in May 2010 and noted a lack of AC joint tenderness or atrophy with respect to the right shoulder.  (Id. at 521.)  He noted some limitations with range of motion but found the shoulder MRIs from Dr. Clar's office to be unremarkable.  (Id.)  His assessment of right shoulder pain also included the following statement:  "I think that the patient has a problem which I cannot fix.  I told him that I think he is addicted to pain medicine."  (Id.)  Dr. Garelick offered Pogatetz a diagnostic arthroscopy but also warned him that such an intervention could make his current condition worse.  (Id.)

## B.    Medical Evidence—Mental Health

In September 2009, two months after filing for benefits, Pogatetz sought help with his anxiety and depression from the Community Counseling Centers of Chicago.  (A.R. 438.)  Pogatetz told mental health professional Maribel Ruiz Eggleston, MSW, that he felt overwhelmed by his physical pain, the loss of functionality of his body, financial pressures, and the future.  (Id.)  Ruiz Eggleston provided a provisional diagnosis of Adjustment Disorder with Depressed Mood/Brief

Depressive Reaction and a GAF score of 45.[3]  (Id. at 437.)  During the initial evaluation Ruiz Eggleston noted Pogatetz to be well-groomed, calm, and cooperative.  (Id. at 441.)  The record contains visit summaries through May 2010.  Collectively the treatment notes speak to Pogatetz's social withdrawal, depression, hopelessness, low self-esteem, and obsessive thoughts, among other symptoms.  (Id. at 525-34.)  One treatment note indicates that Pogatetz "is engaging in services but has poor follow through with treatment recommendations."  (Id. at 534.)

In addition to weekly therapy sessions, Pogatetz met with Dr. Shahid Ahmad for medication management and also initially for completion of a Psychiatric Evaluation Form on October 15, 2009.  (Id. at 451-57.)  Dr. Ahmad recorded Pogatetz's fluoroquinolone allergy and his full-body pain, but then noted that "all blood work, MRIs were normal."  (Id. at 451.)  Dr. Ahmad noted Pogatetz to be restless, anxious, and depressed and prescribed Xanax for anxiety.  (Id. at 452-53, 456.)  In November 2009, Dr. Ahmad noted that Pogatetz was compliant with his medications and reported doing a little better since starting the Xanax:  "[h]e feels relaxed, some improvement [with] pain."  (Id. at 450.)  Dr. Ahmad noted repeatedly that Pogatetz felt he was "not ready" for an antidepressant.  (Id. at 450, 455.)

---

[3]  The GAF scale ranges from 0 to 100 and is a measure of an individual's "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000) ("DSM-IV-TR").  GAF scores of 41-50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

However, by April 2010, the record indicates that Pogatetz added Cymbalta to his treatment regime, which is used to treat depression and anxiety. (Id. at 544.)

In December 2009 Dr. Jerrold Heinrich reviewed Pogatetz's file on behalf of DDS. (Id. at 461-77.) Dr. Heinrich completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique and noted a diagnosis of affective disorder (depression) and generalized anxiety disorder. (Id. at 468, 470.) He found that Pogatetz has the cognitive functioning to understand, remember, and execute simple instructions consistently; can concentrate and persist on tasks within an organized setting where speed of performance is not essential; can adjust to routine changes provided they are not too frequent; but lacks the emotional temperament to interact frequently with others. (Id. at 463.) He found Pogatetz to have mild limitations with respect to activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no evidence of decompensation. (Id. at 475.) He did not find Pogatetz fully credible, noting that the clinical evidence "does not fully substantiate the claimant's allegations and symptoms"—including allegations that he has trouble with his memory and only changes his clothes every 10 days. (Id. at 477.)

In March 2010, Ruiz Eggleston completed a Residual Functional Capacity Questionnaire on Pogatetz's behalf. (Id. at 576-79.) She listed "[m]ajor [d]epression due to medical condition" and "generalized anxiety disorder" as the main diagnoses, (id. at 576), with "significant financial stress," "peripheral neuropathy [and] chronic tendinopathy—quinolone-induced arthralgias," and "CNS [central nervous system]

disturbance [and] agitation" as secondary diagnoses. (Id.) In filling out a chart entitled "mental abilities and aptitude needed to do unskilled work," Ruiz Eggleston indicated that she completed the chart "as reported by patient." (Id. at 578.) Accordingly, Pogatetz rated himself as anywhere from "very good" to "fair" in numerous categories reflecting various work-related tasks, such as the ability to "remember work-like procedures" and to "complete a normal workday and work week without interruptions from psychologically based symptoms." (Id.) He did not characterize himself as "poor" in any category. (Id.) Finally, Ruiz Eggleston assessed the following functional limitations: Pogatetz has moderate restriction as to activities of daily living, moderate difficulties in maintaining social functioning, frequent deficiencies of concentration, and one or two episodes of decompensation. (Id. at 579.) Dr. Ahmad signed the report Ruiz Eggleston completed. (Id.)

Ruiz Eggleston again completed an identical questionnaire nine months later in December 2010 for Dr. Ahmad's signature. (Id. at 607-09.) Ruiz Eggleston reiterated the earlier diagnoses in the questionnaire, except that this time Pogatetz reported his ability to complete the various mental abilities and aptitudes needed to perform unskilled work as "fair" and "poor/none." (Id. at 608.) Ruiz Eggleston also noted greater functional limitations than before: Pogatetz has extreme restrictions as to activities of daily living, marked difficulties in maintaining social functioning, constant deficiencies of concentration, and continual episodes of decompensation. (Id. at 609). She also anticipated that Pogatetz's impairments would cause him to miss work more than three times a month. (Id.)

C.    **Third-Party Evidence**

Pogatetz's friend, roommate, brother, and mother all submitted letters on his behalf. (A.R. 172-73, 324, 387-88, 403-04.) Each of these letters details Pogatetz's physical and mental deterioration over the years and his daily struggles. Also in the file are a number of medical articles authored by Dr. Jay Cohen about fluoroquinolone antibiotics and their side effects, (id. at 589-601), as well as a letter from Dr. Todd Plumb who states he has been in contact with Pogatetz and that Pogatetz suffers from Noroxin-induced tendinopathy, (id. at 389).

D.    **Pogatetz's Testimony**

During the hearing before the ALJ Pogatetz described himself as a single male with a bachelor's degree in English. (A.R. 52.) He is currently unemployed, lives with a roommate, pays his bills by "maxing out on credit cards," and receives government assistance through a Link Card and medical card. (Id. at 53.) He previously worked as a waiter while in college and then as an administrative receptionist three days a week until his physical pain made work impossible. (Id. at 53-54.) As a receptionist he was responsible for general office work. (Id. at 69-70.) But because of his shoulder pain, he was unable to write long-hand and was able to type only by using one finger. (Id. at 70.) Sometimes he took unscheduled breaks in the bathroom because of pain. (Id.)

Pogatetz explained that although he received care from West Town Clinic in Chicago, he preferred Stroger Hospital as the latter had more resources and abilities to run tests and prescribe medications. (Id. at 45-47, 50-51.) While at

Stroger, Pogatetz received a cortisone shot in his right shoulder that he described as crippling, as well as a prescription for a narcotic called Tramadol and a TENS unit. (Id. at 48, 57-58.)  He testified that Dr. Edelberg is his "main" doctor who knows about his antibiotic-induced condition.  (Id. at 52.)  He has seen Dr. Edelberg only twice but is able to get morphine refills by calling or emailing his office.  (Id. at 78-79.)

Pogatetz testified that he is in constant pain and takes a time-release dose of morphine three times a day, despite side-effects including fatigue, lethargy, and spaciness.  (Id. at 68.)  Over the years, he has also taken Vicodin and Tramadol. (Id. at 63-64.)  He used to jog five miles several times a week but now struggles to even stand and walk.  (Id. at 72.)  He experiences pain in both shoulders that radiates to his fingers, as well as pain in his hips, knees, ankles, and Achilles tendons.  (Id. at 59.)  His right shoulder is the most painful part of his body and hurts "24/7" at a pain level of 10 out of 10.  (Id. at 60-61.)  To relieve the pain, he lies down, sits down, goes to bed, or takes pain killers.  (Id. at 61, 63.)  After his right shoulder, his ankles are the most painful body parts, followed by his knees, then his left shoulder, and then both hips.  (Id.)  Some days he stays in bed all day.  (Id. at 73.)  He often sleeps poorly and has a decreased appetite.  (Id. at 74.)

Pogatetz testified that he is in too much pain to even drive.  (Id. at 58.)  He no longer cooks because he cannot lift pots, stir things, or clean up afterwards.  (Id. at 59.)  He testified that he sometimes needs help taking care of personal grooming. (Id. at 59-60.)  He no longer exercises on account of his pain, but enjoys meditating

and being outside. (Id. at 60.) He has friends but does not engage in social activities on a regular basis. (Id.) He grocery shops as long as someone comes with him to carry the bags. (Id.) He can walk a block or two but sometimes has to sit and rest. (Id. at 66.) He can comfortably stand for five or ten minutes and can comfortably sit for twenty to thirty minutes. (Id.) He cannot lift anything heavier than his house keys or maybe a cell phone with his right extremity. (Id. at 67.) He believes the most he can lift with his left hand is a cup of coffee. (Id. at 68.)

Pogatetz also testified that he is depressed about what has happened to his body, the magnitude of his pain, and his severely reduced quality of life. (Id. at 71.) He often cries, is irritable, and isolates himself from others. (Id. at 71-74.) He feels anxious when he goes out and is worried he will be jostled or his pain will get worse. (Id. at 73.) Most of his friends have abandoned him because they do not want to deal with his complaints. (Id. at 72.)

## E.     Medical Expert's Testimony

Medical expert Dr. Ellen Rozenfeld, a psychologist, testified as to whether and to what extent Pogatetz could engage in some form of employment given his anxiety and depression. Dr. Rozenfeld noted that Pogatetz's primary condition is pain, with depression and anxiety being the secondary conditions. (A.R. 85-86.) She did not find Pogatetz's mental condition sufficient to meet or equal a listing. (Id. at 87.) She opined that despite his intelligence he should be limited to simple, routine tasks and to a position where he would not have sustained contact with the general public or have to engage in joint projects with co-workers because of his

anxiety and depression. (Id. at 87-88.) But even with these limitations, she felt that from a mental health perspective, Pogatetz is capable of engaging in sustained work. (Id. at 88.)

**F.      Vocational Expert's Testimony**

Vocational Expert ("VE") Cheryl Hoiseth answered the ALJ's questions concerning the kinds of jobs someone with certain hypothetical limitations could perform. (A.R. 90-92.) After the VE found Pogatetz unable to perform his past work of receptionist or waiter, the ALJ presented a hypothetical individual with a light residual functional capacity ("RFC") and the following limitations: standing/walking/sitting for six hours out of an eight-hour workday; unlimited pushing and pulling; occasional posturals; limited overhead manipulation with both arms; no limit on communication, vision, or environment; only simple, routine types of work; limited social interaction, meaning no sustained contact with the general public or need to engage in joint projects with co-workers; and a predictable, routine environment. (Id. at 90.) The VE answered that such an individual would be able to work as an office helper, cleaner/housekeeper, or cafeteria attendant. (Id. at 90-91.)

Changing the RFC to a sedentary level, the following limitations were posited: standing/walking two hours out of an eight-hour workday; sitting six hours out of eight; unlimited pushing and pulling; occasional posturals; limited overhead manipulation with both arms; no limit on communication, vision, or environment; only simple, routine types of work; limited social interaction (same as for the light

work RFC); and a predictable, routine environment. (Id.) The VE testified that a person with these limitations would be able to work as a table worker/hand packager of light items, or as a production worker (taper) of electronics. (Id. at 91.) An employee performing the sedentary work would need to be on-task 90% of the time, while an employee performing the light work would need to be on-task 80% of the time. (Id. at 92.) Both the light and sedentary jobs would permit an absence of once a month, but being absent more than once a month or needing to take a 15-minute break every hour or so would preclude employment. (Id.) A worker who could not use his right extremity for reaching, handling, or fingering would not be employable in unskilled, sedentary work. (Id. at 93.)

## G.     Post-Hearing Medical Evidence

Following the August 2010 hearing before the ALJ, Pogatetz received additional medical treatment from Rush University Medical Center. Most significantly, an MRI of his right shoulder in November 2010 revealed a partial articular surface tear of the anterior supraspinatus tendon, mild to moderate tendinopathy in other portions of the shoulder, mild acromioclavicular degenerative arthrosis, and a chronic anterior/superior labral tear. (A.R. 622-23.) The medical record also contains a letter from Dr. Edelberg dated August 10, 2010, in which he characterized himself as Pogatetz's "attending physician" and confirmed that he has been treating Pogatetz with MS-Contin (morphine). (Id. at 588.) He described Pogatetz's condition as widespread tendon damage that is "an uncommon but well documented side effect of the quinolones (Cipro, Levaquin, Avelox) and is currently

the basis of a well-deserved class action lawsuit against the manufacturing company."[4] (Id. at 588.)

## H.    The ALJ's Decision

The ALJ concluded that Pogatetz is not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (A.R. 12-26.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

---

[4] *In re Levaquin Products Liability Litigation* is a multidistrict litigation ("MDL") involving the fluoroquinolone antibiotic Levaquin. The MDL plaintiffs all were prescribed Levaquin, and all allege that it causes tendons to rupture. *See, e.g., In re Levaquin Prods. Liab. Litig.*, MDL No. 08-1043 JRT, 2008 WL 4534229, at *1 (D. Minn. Sept. 29, 2008). Several plaintiffs within this MDL have gone to trial, with differing results. Plaintiff John Schedin recovered compensatory damages based on a failure to warn claim against Ortho-McNeil-Janssen Pharmaceutical, Inc. *In re Levaquin Prods. Liab. Litig., Schedin v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F. Supp. 2d 1125 (D. Minn. 2011), *aff'd in part, rev'd in part*, 700 F.3d 1161 (8th Cir. 2012). Plaintiff Clifford Straka was not successful. In his case, *In re Levaquin Prods. Liab. Litig., Straka v. Johnson & Johnson, and Janssen Pharm., Inc.*, MDL No. 08-1943 JRT, 2012 WL 4481223 (D. Minn. Sept. 28, 2012), the jury concluded that although the defendants had failed to warn plaintiff's prescribing physicians of the risks associated with Levaquin, that failure was not the direct cause of plaintiff's injuries. *See also Rhodes v. Bayer Healthcare Pharm., Inc.*, No. 10-1695, 2013 WL 1282450 (W.D. La. March 28, 2013) (products liability and failure to warn case brought by sufferer of peripheral neuropathy against manufacturer of the fluoroquinolone antibiotic Avelox was dismissed for failure to proffer an expert to establish causation).

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the residual functional capacity ("RFC") to determine at steps four and five whether the claimant can return to his past work or to different available work. *Id.* at § 404.1520(f), (g).

Here, at steps one and two of the analysis, the ALJ determined that Pogatetz has not engaged in substantial gainful activity since the date of his last employment and that he suffers from the following severe impairments: right shoulder injury and tendinopathy/tendonitis, generalized anxiety disorder, and major depressive disorder secondary to pain. (A.R. 14.) At step three, the ALJ declined to find that Pogatetz has an impairment or combination of impairments that meets or equals one of the listed impairments in 20 C.F.R. § 404, Subpart P., Appendix 1. (Id. at 15.) At step four, the ALJ concluded that Pogatetz:

> has the [RFC] to perform light work . . . including lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, sitting and standing/walking each for 6 hours in an 8-hour workday, and unlimited pushing and pulling—except that [he]
> — Can only occasionally perform the postural positionings—climbing, balancing, stooping, kneeling, crouching and crawling);
> — Can perform only limited reaching overhead bilaterally;
> — Has no communicative, visual or environmental limitations;
> — Is limited to performing simple, routine work;
> — With limited social interaction with others and not be required to have sustained contact or interaction with the general public;

&mdash; Can work around coworkers in a collegial environment, but should not work in cooperation with other employees or on a team; and

&mdash; Can work under limited supervision in a routine, predictable environment.

(Id. at 17.) At step five, the ALJ found that Pogatetz's RFC allows him to work as an office helper, cleaner/housekeeper, or cafeteria attendant. (Id. at 25.) Accordingly, the ALJ found that Pogatetz is not under a disability as defined by the Social Security Act and denied his claim for benefits. (Id.)

## I. Post-Decision Information

The Administrative Record contains medical records generated after the ALJ issued her decision on November 24, 2010. In January 2011, Dr. Edelberg wrote a medical note for inclusion in the record in which he stated that Pogatetz has developed "18 out of 18 tender points consistent with [a] diagnosis of fibromyalgia." (Id. at 606.) A month later, in February 2011, Dr. Edelberg wrote another letter elaborating upon both fibromyalgia and diffuse quinolone tendon damage and their modes of diagnosis and treatment. (Id. at 320-21.) He also disagreed with the ALJ's decision, particularly as to her conclusion that his opinions were entitled to "very little weight." (Id. at 320.) NP Ceballos submitted another Chronic Pain RFC Questionnaire in January of 2011, providing diagnoses of chronic pain syndrome, quinolone toxicity syndrome, fibromyalgia, peripheral neuropathy, bilateral shoulder injuries, depression, and anxiety. (Id. at 611-13.) Someone named "M. Senguria" noted in February 2011 that he/she had contact with Pogatetz for six months and provided a diagnosis of fibromyalgia. (Id. at 614-16.) Ruiz Eggleston

and Dr. Ahmad also wrote a letter in March 2011 expressing their view that Pogatetz's "mood disorder due to medical condition and generalized anxiety disorder cause[ ] significant impairment" and "limit his ability to function in social and work settings." (Id. at 322.) Finally, the record contains a letter from a chiropractor dated September 20, 2011, regarding treatment provided to Pogatetz between 2004 and 2005 for complaints of joint and nerve pain. (Id. at 323.)

## Analysis

Pogatetz argues that this court should reverse the ALJ's decision because of errors allegedly made relative to the weight the ALJ afforded the opinions of various medical and non-medical sources, as well as with respect to her credibility and RFC determinations. Pogatetz also claims that the Appeals Council erred in declining to review the ALJ's decision despite the existence of new and material evidence. This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and is free of legal error. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the

evidence or substitute its own judgment for the ALJ's. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Only with respect to the Appeals Council's refusal to review the ALJ's decision will the court engage in a *de novo* review. *See Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012).

## A. Treating Physicians

Pogatetz first argues that the ALJ's decision to afford little weight to the opinions of Dr. Edelberg, Dr. Clar, and NP Ceballos was improper. The court will address each in turn.

### 1. Dr. David Edelberg

Dr. Edelberg, an internal medicine physician with WholeHealth Chicago, examined Pogatetz twice over the course of seven months and provided a diagnosis of fluoroquinolone induced polytendonitis and polyneuropathy. (A.R 505-08.) He found that Pogatetz suffers "excruciating pain throughout his entire body," has joints that are "extremely painful to palpation," and has markedly diminished range of motion in his right shoulder. (Id. at 505.) The ALJ deemed Dr. Edelberg's findings largely based on Pogatetz's subjective complaints and unsupported by the objective medical evidence—for instance, the numerous MRIs of Pogatetz's right shoulder showing "essentially negative findings other than impressions of supraspinatus and subscapularis tendinopathy and, in April 2009 specifically, a small partial labral tear." (Id. at 19.) The ALJ also discredited Dr. Edelberg's conclusions based on the observations of Dr. Takieddine, who examined Pogatetz during the same time frame and found him to be smiling and comfortable and to

have normal examination results. (Id. at 21.) The ALJ also felt that the very limited treatment relationship of just two visits tended to "curtail Dr. Edelberg's representation that he is Pogatetz's 'attending physician.'" (Id. at 21, 588.)

The court finds no error with the ALJ's determination. Although there is some ambiguity in the record and in the ALJ's decision as to whether she considered Dr. Edelberg to be a "treating source," the court will consider him as such for purposes of this review.[5] As a treating source, Dr. Edelberg's opinion is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record. *See* 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ may discredit a treating source's medical record, however, if it is internally inconsistent or inconsistent with the opinion of a consulting physician—provided the ALJ minimally articulates her reason for crediting or rejecting evidence of disability. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). A decision to deny controlling weight to a treating source's opinion does not prevent the ALJ from considering it. She may still look to

---

[5] A "treating source" is defined as a "physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Conversely, a "nontreating source" is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." *Id.* During the hearing, the ALJ asked Pogatetz whether his treating doctor is Dr. Edelberg, to which Pogatetz answered in the affirmative. (A.R. 66.) Slightly later, however, the ALJ queried whether there was anything more in the record documenting their relationship aside from the two treatment notes. (Id. at 78.) Pogatetz answered "no" and elaborated that he pays out of pocket to see the doctor and thus only sees him when he can afford to do so. (Id.)

the opinion, even after opting to afford it less evidentiary weight. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See* 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (d)(3), (d)(5).

The relevant issue here is whether the ALJ sufficiently articulated her reasons for minimizing the weight assigned to Dr. Edelberg's opinion. The court finds that she met this flexible standard. By highlighting Dr. Edelberg's very limited treatment relationship, the lack of objective medical findings supporting the level of debilitating pain alleged, the contradictory findings of Stroger Pain Clinic physician Dr. Takieddine (made the same month as Dr. Edelman's first examination), and the much less dire findings of numerous MRIs, the ALJ more than minimally articulated her reasons for discrediting Dr. Edelberg's opinions. And while Pogatetz takes issue with the ALJ's decision to select the conclusions of various non-treating sources over a treating source, the ALJ is permitted to do so where she concludes that the treating source's opinion is not well-supported by medically acceptable diagnostic techniques and not consistent with other evidence of the record. *See Punzio*, 630 F.3d at 713; *see also Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006) (discussing circumstances in which other medical evidence is given greater weight than the conflicting evidence of treating physicians).

## 2.    Dr. Steven Clar

Dr. Clar is a treating source physician who examined Pogatetz some nine times over two years and filled-out an RFC questionnaire on November 5, 2009. (Id. at 299-304.)  Dr. Clar's RFC focused exclusively on Pogatetz's right shoulder, which he believed would likely cause Pogatetz to be absent from work more than three times a month and would require unscheduled breaks every 30 minutes for 5 minutes at a time.  (Id. at 302, 304.)  The ALJ afforded Dr. Clar's RFC opinion "some weight insofar as they have evidentiary support for no limitations to the left upper extremity and ambulating without an assistive device." (Id. at 22.)  However, she then found "scant objective evidence to support the level of pain that would require unscheduled breaks every thirty minutes.  Further, the manipulative limitations to the right upper extremity seem inconsistent with Dr. Clar's own clinical findings of full range of motion."  (Id.)  Pogatetz now argues that these determinations were in error as Dr. Clar's diagnoses were based on a review of numerous right shoulder MRIs indicating supraspinatus tendinopathy, acromioclavicular osteoarthritis, and a possible labral tear.  (R. 21, Pl.'s Br. at 11.)

Once again, as a treating source, Dr. Clar's opinion is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).  And once again, the relevant issue here is whether the ALJ sufficiently articulated her reasons for reducing the weight assigned to Dr. Clar's opinion.  The court finds that she did.

The ALJ noted that Dr. Clar's RFC addressed only Pogatetz's right shoulder pain. With this limitation in mind, she evaluated the RFC opinion against Dr. Clar's own examination notes from the prior year indicating that Pogatetz had full range of motion in his right shoulder and only a mildly positive Hawkins Test. (A.R. 22, 347.) She concluded that these findings were inconsistent with Dr. Clar's subsequent opinion that Pogatetz would be extremely limited with respect to the use of his right extremity (between 10% and 25% functionality), would need a five-minute break every thirty minutes, and would likely have medical absences three times a month. Substantial evidence therefore supports the ALJ's conclusion that Dr. Clar's RFC recommendation is entitled to little weight. *See Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

One further point regarding the ALJ's treatment of Drs. Clar and Edelberg deserves greater discussion: a very notable aspect of the medical record is the existence of records from five other doctors, including four pain, surgical or shoulder specialists, all of whom examined Pogatetz once between May 2009 and May 2010— the same time period within which Pogatetz received care from Drs. Clar and Edelberg—but none of whom found Pogatetz to suffer from injuries nearly as severe as suggested by the two treating source physicians. Dr. Jacob Manuel, an orthopedic physician with Stroger Hospital, examined Pogatetz in May 2009 and reviewed the MRIs, noting right shoulder tenderness with provocative movements of the bicep and the possibility of a SLAP tear, but also good strength and good overhead flexion. (A.R. 362.) Dr. Sami Takieddine, an anesthesiologist with

Stroger Hospital, examined Pogatetz in October 2009 and noted that he was "comfortable [and] smiling" while reporting a pain level of eight out of ten, had a completely normal gait, a normal range of motion in his joints, a normal soft tissue examination, normal muscle strength, and placed a heavy bag on his right shoulder despite reports of severe pain. (Id. at 557-58.) Dr. Nishitkumar Patel, an orthopedic surgeon with Mount Sinai Hospital, reviewed Dr. Clar's MRIs when he examined Pogatetz in January 2010, noting the presence of tendinopathy and a possible labral abnormality along with some AC joint pain and tenderness, but also finding Pogatetz to have full range of motion. (Id. at 519.) Dr. David Garelick, an orthopedic surgeon and shoulder specialist with Mount Sinai Hospital, examined Pogatetz in May 2010 and also reviewed the MRIs, finding them to be "unremarkable" and noting a lack of tenderness with the AC joint. (Id. at 521.) Finally, state examining physician Dr. Linda Palacci noted in her report that while Pogatetz had diminished right shoulder range of motion and severe pain during these range of motion exercises, he was able to squeeze a blood pressure cuff, pick up coins and a pen, tie his shoes, and button and unbutton with no difficulty. (Id. at 392, 394.) He experienced mild difficulty turning a door knob but had grip strength of five out of five. (Id. at 394.) She noted no problems associated with any other joint. (Id. at 394.)

While these doctors are not treating sources, it is compelling that none of them were able to find any impairment suggestive of the level of disability recommended by Drs. Clar and Edelberg. The ALJ took note of each of these

reports in her medical summary and specifically noted that she was affording the Stroger and Mount Sinai Hospital doctor opinions "great weight" based on their objective clinical findings, while she afforded considerably less weight to the two treating physicians based on the lack of objective evidence and "disproportionate" clinical findings (Dr. Edelberg) or RFC conclusions that were "inconsistent" with the doctor's own clinical findings (Dr. Clar). (Id. at 21-22.) Against the backdrop of the ALJ's discussion of these numerous and consistent examinations by pain and orthopedic specialists, as well as Dr. Palacci, the court reiterates its conclusion that the ALJ fully considered the relevant medical record when deciding that Dr. Edelberg's and Dr. Clar's opinions were either not well-supported by medically acceptable diagnostic techniques or not consistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *see also Punzio,* 630 F.3d at 713 (noting that an ALJ's examination of a treating source's opinion against other evidence in the record "will weed out those who are either poorly versed in their patient's condition or unable to opine objectively").

Finally, while Pogatetz argues that the observations of these non-treating source doctors may have been the consequence of them having seen him on a "good" day, as opposed to a "bad" day, (R. 21, Pl.'s Br. at 10), the court disagrees that Pogatetz has provided any evidence as to having a "good" day of sufficient painlessness to explain away these findings—especially the observations that he was able to carry a heavy bag on his right shoulder or perform full range of motion exercises. Pogatetz testified at the hearing that he is in constant ("24/7") pain, often

with a pain level of 10 out of 10, and that he can lift no more than keys or a phone. (A.R. 67.)  He also submitted into the record a summary dated July 20, 2009, that he prepared himself wherein he described his right shoulder pain as "constant" and claimed that he was unable to use his right arm for such basic tasks as turning pages, typing, or opening doors.  (Id. at 231-33).  In a second summary dated August 2010, Pogatetz stated that on the days he is able to get out of bed, he still suffers pain of such severity that he cannot leave the house or stand for long periods.  (Id. at 313-14.)  Pogatetz made similar comments during the hearing.  (Id. at 72-73.) This collective evidence does not support Pogatetz's contention that on a "good" day he is able to carry a heavy bag on his right shoulder.  Accordingly, the court finds the good-day argument unpersuasive.

### 3.    Nurse Practitioner Daniel Ceballos

NP Ceballos met with Pogatetz once in August 2009 and then a few weeks later completed an RFC questionnaire in which he concluded that Pogatetz has no use of his right arm, would need a 15-minute break every hour if working, and would be absent from work more than three times a month.  The ALJ afforded NP Ceballos's opinion "very limited weight" based on her finding that "it is simply unsupported by the preponderance of the objective medical evidence," as well as on the fact that he is not a recognized medical provider and had only a brief treatment history with Pogatetz.  (Id. at 21-22.)  Pogatetz takes issue with this determination asserting that the ALJ failed to assess this medical opinion pursuant to the checklist items enumerated in 20 C.F.R. § 404.1527(c).

The applicable social security regulations require ALJs to consider all relevant evidence in an individual's record. Relevant evidence may come from "acceptable medical sources," such as licensed physicians and psychologists, or from "other sources," such as nurse practitioners and licensed clinical social workers. SSR 06-03p, 2006 WL 2329939, at *2 (August 9, 2006); *see also* 20 C.F.R. § 416.913(d)(1) (listing nurse practitioners among occupations that are not "acceptable medical sources"). That being said, only "acceptable medical sources" may give medical opinions "that reflect judgments about the nature and severity of [the claimant's] impairment(s)," including symptoms, diagnoses and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Similarly, only "acceptable medical sources" can be considered treating sources. SSR 06-03p at *2; *see also* 20 C.F.R. §§ 404.1502, 416.902. While the social security regulations provide criteria for evaluating the medical opinions of "acceptable medical sources," there is less clarity as to how to consider opinions and evidence from "other sources" like nurse practitioners. SSR 06-03p instructs that the same factors used to evaluate medical opinions from "acceptable medical sources" can be applied to "other sources," although not every factor will apply in every case. SSR 06-03p at *5-*6.

The court finds that substantial evidence supports the ALJ's decision to give NP Ceballos's RFC opinion "very limited weight." According to SSR 06-03p, "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the

determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at *6 (noting also that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination"). The ALJ based her conclusion on a disparity between NP Ceballos's findings that Pogatetz suffers poor knee strength (two on a scale of five) and other medical evidence indicating normal knee strength (five on a scale of five), as well as his own observation that Pogatetz was able to walk with a steady gate. (A.R. 21.) The ALJ noted that no other provider recommended in favor of environmental restrictions or found Pogatetz completely unable to use his right hand (something even Pogatetz does not assert). (Id. at 22.) She further explained that NP Ceballos had a very limited treatment history (just one visit) and further that he is not a recognized medical provider. (Id.) The court is satisfied that the ALJ complied with the guidelines established in SSR 06-03p.

## B.     Credibility Analysis

If, as here, the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which the symptoms limit his ability to work. In making this determination the ALJ considers the entire record, including "the claimant's pain level, medication, treatment, daily activities, and limitations." *Schomas v. Colvin*, 732 F.3d 702, 708-09 (7th Cir. 2013); *see also* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); 20 C.F.R. § 404.1529(a). This analysis also requires the ALJ to make a credibility determination as to the claimant's statements about his pain and other symptoms.

SSR 96-7p at *1.  Pogatetz argues that the ALJ improperly assessed his credibility by using boilerplate language and by failing to build a logical bridge between the evidence and her conclusion that his testimony was less than credible and exaggerated.  But Pogatetz has a particularly high hurdle to overcome here because this court may only overturn an ALJ's credibility assessment if it is "patently wrong."  *See Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004).  That means that this court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Pogatetz "must do more than point to a different conclusion that the ALJ could have reached."  *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Pogatetz contends that the ALJ's credibility analysis was insufficient and consisted only of a single statement: "the objective medical evidence simply does not support the alleged degree of debilitating pain throughout the claimant's body or the alleged extent of his physical limitations."  (R. 21, Pl.'s Br. at 14; A.R. 19.)  The court disagrees.  The ALJ expressly stated that Pogatetz's complaints of constant pain throughout his entire body had "limited credibility" and that she felt there was a "degree of magnification of symptoms" and of "inconsistencies in the record" that underscored her conclusion.  (A.R. 18.)  In support, she cited the results of several MRIs yielding essentially normal findings outside of tendinopathy and mild arthritis and, in the latest one, a small partial labral tear; the notation of Dr. Takieddine observing Pogatetz to be comfortable and smiling at the pain clinic despite allegations of extreme pain; the findings of shoulder specialist Dr. Garelick, who noted unremarkable MRIs, no AC joint tenderness, and no objective problems

with the right shoulder; and the observations of various other physicians that Pogatetz walked with a normal gait and had full range of motion. His allegations of needing to use an ankle brace and a cane despite an absence of support for needing these assistive devices further reduced Pogatetz's credibility. The ALJ provided sufficient explanation for why she found Pogatetz's symptoms to be magnified and his testimony to be exaggerated.[6] Accordingly, there is no basis for the court to find this aspect of the ALJ's credibility analysis to be "patently wrong." *See Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong' and deserving of reversal.")

Similarly, the court disagrees with Pogatetz's claim that the ALJ failed to analyze his activities of daily living or the type, dosage, effectiveness, and side effects of medication as directed in SSR 96-7p. The ALJ noted his testimony regarding the extent of his constant and "crippling" right shoulder pain, constant pain in his ankles, knees, left shoulder, and hips, and pain sensations of a burning and tingling nature. (A.R. 17-18.) Regarding his activities of daily living, the ALJ addressed in her step-three analysis that Pogatetz suffers moderate restrictions in this area, noting that he can shop in stores but needs help with the bags, can groom

---

[6] In *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004), the Seventh Circuit held that pain alone, even when unsupported by objective evidence, can be sufficient for a disability finding. But in cases where there is a lack of objective medical findings supporting the claimant's allegations of severe pain, the ALJ must be alert to the possibility of exaggeration and carefully evaluate the claimant's credibility so as to separate out those claimants who are alleging to feel more pain than they actually do from those claimants whose pain is truly a reflection of a disabling condition. *Id.* at 754.

himself but struggles due to a loss of functionality in his right arm, and relies on his roommate for food preparation and housekeeping. (Id. at 15-16.) She also summarized some of his daily living limitations at step four, including testimony from Pogatetz that he cannot lift a coffee cup with his right hand or reach overhead with his right arm, can only walk for one block, and can only stand for five minutes before needing to sit down. (Id. at 18.) Regarding his medications, the ALJ noted that Tramadol was ineffective, while morphine sulfate CR appears to be effective. (Id. at 18-19.) She also took note of Dr. Edelberg's prescription of both Vicodin and Methadone, the latter of which Pogatetz said he tolerated poorly. (Id. at 19.) While not a perfectly complete analysis, these references, taken together, allow the court to sufficiently examine that which the ALJ relied upon when she concluded that Pogatetz's allegations of pain and daily limitations were not fully credible. *See Pepper*, 712 F.3d at 369 (finding that although the ALJ could have been more specific, the ALJ's explanation was sufficient and thus not "patently wrong"). An ALJ is not required to mention every piece of evidence in the medical record provided she articulates some legitimate reasons for her conclusions. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Finally, Pogatetz attacks the ALJ's use of the following standard, but oft-criticized boilerplate language:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC].

(A.R. 18.) This language has been criticized by the Seventh Circuit as getting "things backwards," because an ALJ is required to make an independent credibility determination before assessing the claimant's ability to work. *See Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012). This boilerplate suggests that the ALJ disregarded the claimant's testimony because it did not conform to her preconceived view of the RFC. *See id.* But the Seventh Circuit also has made it clear that an ALJ's use of this objectionable language does not amount to reversible error if she "otherwise points to information that justifies [her] credibility determination." *See Pepper*, 712 F.3d at 367-68. In other words, there is no need to reverse based on an ALJ's use of this boilerplate where she gave other reasons, grounded in evidence, to explain her credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). Here, as discussed above, the ALJ provided a number of supported reasons to explain her conclusion that Pogatetz's testimony is less than fully credible.

## C.     The RFC Determination

Pogatetz also challenges the ALJ's RFC determination, asserting that she failed to include in her ruling, and in the hypotheticals posed to the VE, specific language contained in Dr. Jerrold Heinrich's Mental RFC Assessment that Pogatetz could "concentrate and persist adequately on tasks within an organized setting where speed of performance was not essential for the work tasks." (A.R. 463). The Commissioner argues in response that the ALJ reasonably accommodated Pogatetz's problems with respect to concentration, persistence, or pace by limiting

him to work in a routine, predictable environment and to work that is simple and routine.

The ALJ was obligated to include in her RFC only those limitations supported by medical evidence in the record, *see Young v. Barnhart,* 362 F.3d 995, 1003 (7th Cir. 2004), and that she finds credible, *see Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir. 2007). The ALJ's RFC here established that Pogatetz is limited to light, unskilled work with certain mental health restrictions, including a limitation to performing simple and routine work; limited social interaction with others; no sustained contact or interaction with the general public; no requirement to work in cooperation with other employees or on a team; and limited supervision in a routine and predictable environment. (A.R 17.) Given these restrictions, the court finds no merit to Pogatetz's claim that the RFC failed to incorporate an "organized setting" restriction. The court can discern little to no difference between Dr. Heinrich's recommendation that Pogatetz work in an "organized setting" and the RFC's restriction that he work in a "routine, predictable environment."

Similarly unavailing is Pogatetz's assertion that the RFC is defective because neither it nor the hypothetical posed to the VE contains specific language regarding a limitation on pace. The court notes conflicting language within Dr. Heinrich's RFC assessment: on the one hand, Dr. Heinrich found that Pogatetz is not significantly limited with respect to his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods," (id. at 461-62), but then he otherwise notes that Pogatetz "could concentrate and persist adequately on tasks within an organized setting where speed of performance was not essential for the work task," (id. at 463). The ALJ did not specifically mention this disparity, although she did favorably credit Dr. Heinrich's conclusions that Pogatetz suffers moderate difficulties in social functioning and concentration and persistence, can perform simple tasks, understand and carry out simple instructions consistently, adjust to infrequent changes, and infrequently interact with others. (Id. at 22.) With these restrictions in mind, she then limited Pogatetz to simple, routine, unskilled work and further restricted his exposure to co-workers, supervisors, and the general public. The court concludes that this is an appropriate limitation, regardless of some conflicting language within the assessment. The Seventh Circuit has stated that "claimants who 'often experience[ ] deficiencies of concentration, persistence, or pace' are capable of performing semi-skilled work." *Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009) (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). Additionally, "those who are 'mildly to moderately limited in these areas' are able to perform 'simple and repetitive light work.'" *Id.* (quoting *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002)). By limiting Pogatetz to unskilled, simple, and routine work, the ALJ adequately crafted an RFC based on Dr. Heinrich's own findings and limitations—limitations she found both "consistent with the evidence of record and generally affirmed by Dr. Rosenfeld's testimony."[7] (A.R. 22.)

---

[7] At most, the court can find only harmless error with respect to the ALJ's decision

**D. Third Party Evidence**

Next, Pogatetz claims that the ALJ erred in rejecting letters submitted by his friends and family that detail the pain and functional limitations each has observed him to suffer. The ALJ considered the written statements but dismissed them as inconsistent with the preponderance of the medical evidence. (A.R. 23.) The ALJ also dismissed a letter from Dr. Todd Plumb, a doctor of unknown affiliation, on the basis that there is no evidence Dr. Plumb ever examined Pogatetz. (Id.)

As noted earlier in this case, SSR 06-03p addresses the consideration of opinions from non-medical sources, a category that includes nurses, parents, and friends. This ruling states that when evaluating evidence from these non-medical sources, "it would be appropriate to *consider* such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-03p at *6 (emphasis added). Furthermore, the ALJ generally should explain the weight afforded to these opinions or otherwise discuss the evidence in sufficient detail to enable a subsequent reviewer to follow her decision. *Id.* However, the opinions are not medical opinions and thus are not entitled to controlling weight. *Id.* at *2.

Here, the ALJ clearly explained why she found Dr. Plumb's letter to be highly suspicious: there is no evidence that Dr. Plumb ever examined or treated Pogatetz,

---

to afford Dr. Heinrich's opinion "great weight" without mentioning or including the part of the assessment suggesting a pace limitation. But even this is a stretch. The court will not nitpick at every gap in the ALJ's opinion, *see Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) (stating that "[w]hen a claimant argues that there are fatal gaps or contradictions" in the ALJ's decision, the court will give the opinion "a commonsensical reading rather than nitpicking at it").

thus she doubted his ability to opine as to Pogatetz's full body pain and physical limitations. (A.R. 23.) The ALJ made quick work of the remaining letters too, but she did consider them and found them inconsistent with the preponderance of the medical evidence. She explained that the letters corroborated Pogatetz's allegations of pain and functional loss but still did not establish evidence of disability. (Id. at 23.) Considering that the ALJ already had devoted a great deal of her decision to explaining why she found Pogatetz capable of gainful employment and to describing which medical reports she relied upon in making this determination, the ALJ's failure to reiterate at length these same medical reasons in the context of redundant third-party statements is hardly in error. This is not a situation where the ALJ neglected to analyze an entire line of evidence or otherwise fell below the minimal level of acceptable articulation. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (finding that the ALJ's failure to discuss claimant's wife's testimony, which corroborated claimant's own testimony, was not in error).

## E.    New and Material Evidence

Finally, Pogatetz objects to the Appeals Council's refusal to review the ALJ's decision, arguing that he submitted "new and material evidence" that should have resulted in the Appeals Council's review under 20 C.F.R. § 404.970(b). Pogatetz submitted a number of documents subsequent to the ALJ's hearing, but his argument on appeal focuses solely on the February 2011 letter from Dr. Edelberg. The court reviews *de novo* the Appeals Council's decision to deny review of the ALJ's decision. *See Farrell,* 692 F.3d at 771.

Where, as here, the Appeals Council denied review based on an ambiguous finding that the "information does not provide a basis for changing the [ALJ's] Decision," (A.R. 2-3), the Seventh Circuit has interpreted this language to mean that the Appeals Council rejected the additional information as "non-qualifying under the regulations;" in other words, that it was neither "new" nor "material." *Farrell*, 692 F.3d at 771. With this clarification in mind, the court turns to 20 C.F.R. § 404.970(b), which provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision. It will then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record.

These requirements are similarly stated in the Hearings, Appeals and Litigation Law Manual ("HALLEX"), § I-3-3-6, which states:

> For the AC to consider additional evidence, the regulations require that the evidence is new, material, and related to the period on or before the date of the ALJ decision. This means the evidence is:
>
> 1. Not part of the claim(s) record as of the date of the ALJ decision;
>
> 2. Relevant, i.e., involves or is directly related to issues adjudicated by the ALJ; and
>
> 3. Relates to the period on or before the date of the ALJ decision, meaning it is: (1) dated before or on the date of the ALJ decision, or (2) post-dates the ALJ decision but is reasonably related to the time period adjudicated by the ALJ.

Pogatetz maintains that Dr. Edelberg's February 2011 letter contains information both new and material. The court disagrees. HALLEX provides that evidence is

not new when it is duplicative. *Id.* at § I-3-5-20. Dr. Edelberg reiterates in his letter many of Pogatetz's complaints and functional limitations, opines that Pogatetz's condition makes sustained employment impossible,[8] and refers to the Levaquin class-action lawsuits and medical literature. In rendering her decision, the ALJ took into consideration Pogatetz's claim of fluoroquinolone toxicity, including his allegations of pain and functional limitations, the medical literature submitted on this subject, and the existence of pending Levaquin multi-district litigation. In fact, Pogatetz stated during the hearing that he was not part of any lawsuit because he did not experience an Achilles tendon rupture—a prerequisite for inclusion in the Levaquin MDL. As such, the information in Dr. Edelberg's letters concerning fluoroquinolone antibiotics is not "new."

Dr. Edelberg's letter also contains information pertaining to fibromyalgia, but while this information is "new," it is not "material" because it is not relevant to the issues determined by the ALJ: the medical record up through the date of the ALJ's hearing decision contains no reference to a fibromyalgia diagnosis, so any information on this subject is simply outside the bounds of the present claim. *See Schmidt v. Barnes*, 395 F.3d 737, 742 (7th Cir. 2005) (finding no new and material evidence where "[n]one of the proffered evidence speaks to [the claimant's] condition as it existed at or prior to the time of the administrative hearing"); *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2013) ("Medical evidence postdating the ALJ's decision,

---

[8] "Medical source opinions on issues reserved for the Commissioner," such as matters that "direct the determination or decision of disability," are not medical opinions at all and are not entitled to consideration. 20 C.F.R. § 404.1527(e)(1).

unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement.").

Finally, Pogatetz maintains that the Appeals Council should have reviewed his case because Dr. Edelberg's letter explains why his condition, like fibromyalgia, cannot be shown through objective medical evidence or medical tests. Pogatetz maintains that this argument is a "rebuttal to the ALJ's decision to accord treating physician Dr. Edelberg's opinion very little weight." (R. 21, Pl.'s Mot. at 20.) But this argument is really nothing more than a disagreement with the process by which the ALJ resolved Pogatetz's claim. The ALJ was bound to follow the social security regulations, which require evidence of a medically determinable physical or mental impairment. *See* 20 C.F.R. § 404.1505(a). To prove the existence of an "impairment," a claimant must provide evidence of "medically acceptable clinical and laboratory diagnostic techniques" supporting an anatomical, physiological, or psychological abnormality. *Id*. at § 404.1508. However, proving an impairment becomes problematic when a claimant reports symptoms that are not verifiable by medical experts. *See Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). As noted by the Seventh Circuit, a classic example of this situation is pain: "[i]ts existence cannot be verified, and since a person can experience intense, disabling pain even though no physical cause can be found, there is great difficulty in determining whether the person really is experiencing the pain that he reports." *Id*. In cases such as these, the ALJ necessarily must base her decision on the claimant's

credibility. *Id.* And while an ALJ may not disbelieve a claimant's testimony simply because it seems in excess of objective medical evidence, she may "have solid grounds for disbelieving a claimant who testifies that she has continuous, agonizing pain." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006). Here, the ALJ repeatedly noted the lack of objective medical evidence supporting the extent of Pogatetz's complaints of pain, but this was not the full extent of her analysis. She also clearly expressed her reasons for doubting Pogatetz's credibility—not as to whether he experienced pain, but as to whether his pain rendered him disabled. Given the discussion on the ALJ's credibility analysis, the court finds that Pogatetz's final contention also lacks merit.

## Conclusion

For the foregoing reasons, Pogatetz's request is denied and the decision of the Commissioner is affirmed.

**ENTER:**

Young B. Kim
United States Magistrate Judge